## In re AMERICAN EXPRESS MERCHANTS' LITIGATION,

**Italian Colors Restaurant, on or behalf of itself and all similarly situated persons, National Supermarkets Association, 492 Supermarket Corp., Bunda Starr Corp., Phoung Corp., Plaintiffs–Appellants,**

v.

**American Express Travel Related Services Company, American Express Company, Defendants–Appellees.**

**Docket No. 06–1871–cv.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 10, 2007.

Decided: March 8, 2011.

Gary B. Friedman, Friedman Law Group LLP (Tracey Kitzman, Aaron Patton, Warren Parrino, on the brief), New York, NY, for Plaintiffs–Appellants.

Bruce H. Schneider, Stroock & Stroock & Lavan, LLP, New York, NY, Julia B. Strickland, Stephen J. Newman, Stroock & Stroock & Lavan LLP, Los Angeles, CA, Michael K. Kellogg, Derek T. Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, D.C., for Defendants–Appellees.

Before: POOLER and SACK, Circuit Judges.[1]

POOLER, Circuit Judge:

This case returns to us from the Supreme Court. Defendants American Express Company and American Express Travel Related Services Company Inc. (to-

---

1. The Honorable Sonia M. Sotomayor, originally a member of this panel, was elevated to the Supreme Court on August 8, 2009. The remaining two panel members, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); Second Circuit Internal Operating Procedure E(b); *United States v. DeSimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

gether, "Amex") sought review from the Supreme Court following our decision in *In re American Express Merchants Litigation*, 554 F.3d 300 (2d Cir.2009). There, we considered the enforcement of a mandatory arbitration clause in a commercial contract also containing a "class action waiver," that is, a provision which forbids the parties to the contract from pursuing anything other than individual claims in the arbitral forum. We found the class action waiver unenforceable, "because enforcement of the clause would effectively preclude any action seeking to vindicate the statutory rights asserted by the plaintiffs." *In re Am. Express*, 554 F.3d at 304.

On May 3, 2010, the Supreme Court granted Amex's writ for certiorari, vacating and remanding for reconsideration in light of its decision in *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010). The parties submitted supplemental briefing discussing the impact, if any, of *Stolt–Nielsen* on our original decision, and we find no need for oral argument. Finding our original analysis unaffected by *Stolt–Nielsen*, we again reverse the district court's decision and remand for further proceedings, as discussed below.

## BACKGROUND

Because the only issue before us is the narrow question of whether the class action waiver provision contained in the contract between the parties should be enforced, we provide but a brief recitation of the facts.

**A. Procedural Posture.** The plaintiffs appealed from the March 20, 2006 judgment of the United States District Court of the Southern District of New York, which granted Amex's motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA") and Fed.R.Civ.P. 12(b). *See In re Am. Express Merchs.*

*Litig.*, No. 03 cv 9592, 2006 WL 662341 (S.D.N.Y. March 16, 2006) (Daniels, *J.*).

**A. The Parties.** The amended complaint alleges that Amex "is the leading issuer of general purpose and corporate charge cards to consumers and businesses in the United States and throughout the world. It is also the leading provider of charge card services to merchants." The named plaintiffs are: (1) California and New York corporations which operate businesses which have contracted with Amex and (2) the National Supermarkets Association, Inc. ("NSA"), "a voluntary membership-based trade association that represents the interests of independently owned supermarkets."

The named plaintiffs seek to represent the following class:

> all merchants that have accepted American Express charge cards (including the American Express corporate card), and have thus been forced to agree to accept American Express credit and debit cards, during the longest period of time permitted by the applicable statute of limitations ... throughout the United States....

**C. The Card Acceptance Agreement.** The basic contractual relationship between Amex and the plaintiffs was set forth in an affidavit of an Amex executive:

> American Express issues card products to its cardmembers, which cardmembers then use in making purchases from participating merchants. Participating merchants with annual charge volume expected to be less than $10 million agree that, by submitting charges for payment by American Express, their relationship will be governed by the "Terms and Conditions for American Express© Card Acceptance" ("the Card Acceptance Agreement").

The Card Acceptance Agreement is a standard form contract issued by Amex. It may be terminated by either party "at any time by sending written notice to the other party." Further, Amex reserves the right:

> to change this Agreement at any time. We will notify you of any change in writing at least ten (10) calendar days in advance. If the changes are unacceptable to you, you may terminate this Agreement as described in the section entitled "TERMINATING THIS AGREEMENT."

According to Amex, the Card Acceptance Agreement has "expressly permitted amendments upon notice" for more than twenty-five years. The Card Acceptance Agreement also contains a choice of law provision designating New York law as governing and, as Amex states, there is no dispute that the agreement "has always" contained this provision.

By contrast, it is only since 1999 that the Card Acceptance Agreement has contained a mandatory arbitration clause:

> For the purpose of this Agreement, Claim means any assertion of a right, dispute or controversy between you and us arising from or relating to this Agreement and/or the relationship resulting from this Agreement. Claim includes claims of every kind and nature including, but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, intentional tort, statutes, regulations, common law and equity. We shall not elect to use arbitration under this arbitration provision for any individual Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is pending only in that court.
>
> * * *
>
> Any Claim shall be resolved upon the election by you or us, by arbitration pursuant to this arbitration provision and the code of procedure of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed. Claims shall be referred to the National Arbitration Forum (NAF), JAMS/Endispute (JAMS), or the American Arbitration Association (AAA), as selected by the party electing to use arbitration. If a selection by us of one of these organizations is unacceptable to you, you shall have the right within thirty (30) days after you receive notice of our election to select one of the other organizations listed to serve as arbitrator administrator.

At the heart of the instant appeal is the following provision contained in the Agreement:

> IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM ... FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

> There shall be no right or authority for any Claims to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public, other establishments which accept the Card (Service Establishments), or other persons or entities similarly

situated. Furthermore, Claims brought by or against a Service Establishment may not be joined or consolidated in the arbitration with Claims brought by or against any other Service Establishment(s), unless otherwise agreed to in writing by all parties.

The Card Acceptance Agreement thus not only precludes a merchant from bringing a class action lawsuit, it also precludes the signatory from having any claim arbitrated on anything other than an individual basis.

**D. The District Court's Decision.** Amex moved to compel arbitration pursuant to the terms of the Card Acceptance Agreement. In its March 16, 2006 opinion, the district court granted Amex's motion, first holding that the arbitration clause in the Agreement was "a paradigmatically broad clause" which was certainly applicable to the dispute between the parties. *In re Am. Express Merchs. Litig.*, 2006 WL 662341, at *4. The district court also held that "[t]he enforceability of the collective action waivers is a claim for the arbitrator to resolve. Issues relating to the enforceability of the contract and its specific provisions are for the arbitrator, once arbitrability is established." *Id.* at *6. Thus, the district court concluded that all of the plaintiffs' substantive antitrust claims, as well the question of whether or not the class action waivers were enforceable, were subject to arbitration. Having so decided, the district court dismissed plaintiffs' cases against Amex. *Id.* at *10.

■ **E. Our Original Decision, *In re American Express Merchants' Litigation,* 554 F.3d 300 (2d Cir.2009).** The plaintiffs filed a timely appeal. We first decided that the issue of the class action waiver's enforceability was a matter for the court, not the arbitrator. *Id.* at 310. Neither party takes issue with that holding, which we find survives *Stolt–Nielsen.*

We then turned to the question of whether the class action waiver in the Card Acceptance Agreement was enforceable. We found that *Green Tree Financial Corp.–Alabama v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), controlled our analysis:

> to the extent that it holds that when "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." 531 U.S. at 92, 121 S.Ct. 513. We find that the district court erred in ruling that the plaintiffs had failed to bear this burden because they had "ignore[d] the statutory protections provided by the Clayton Act." *In re American Express Merchants Litigation,* 2006 WL 662341, at *5. On the contrary, the record abundantly supports the plaintiffs' argument that they would incur prohibitive costs if compelled to arbitrate under the class action waiver. The Card Acceptance Agreement therefore entails more than a speculative risk that enforcement of the ban will deprive them of substantive rights under the federal antitrust statutes.

*In re Am. Express,* 554 F.3d at 315–16. Based in part on plaintiffs' submission of an affidavit from an economist detailing the fiscal impracticality of pursuing individual claims, we concluded that:

> Amex has brought no serious challenge to the plaintiffs' demonstration that their claims cannot reasonably be pursued as individual actions, whether in federal court or in arbitration, we find ourselves in agreement with the plaintiffs' contention that enforcement of the class action waiver in the Card Acceptance Agreement "flatly ensures that no small merchant may challenge American Express's tying arrangements under the

federal antitrust laws." The effective negation of a private suit under the antitrust laws is troubling because such "private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

*Id.* at 319. Thus, we held that:

> the class action waiver in the Card Acceptance Agreement cannot be enforced in this case because to do so would grant Amex de facto immunity from antitrust liability by removing the plaintiffs' only reasonably feasible means of recovery. As already set forth, Section 2 of the [Federal Arbitration Act], 9 U.S.C. § 2, provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Given that we believe that a valid ground exists for the revocation of the class action waiver, it cannot be enforced under the FAA.

*Id.* at 320. Amex timely filed a petition for certiorari. *Am. Exp. Co. v. Italian Colors Restaurant*, — U.S. ——, 130 S.Ct. 2401, 176 L.Ed.2d 920 (2010). The Supreme Court granted Amex's petition, vacated our original decision, and remanded for further consideration in light of its holding in *Stolt–Nielsen.* The parties submitted supplemental briefing, and we find no need for further oral argument.

## ANALYSIS

As this case was returned to us to consider the applicability of *Stolt–Nielsen*, that is where we begin. In *Stolt–Nielsen*, petitioners were shipping companies. *Stolt–Nielsen*, 130 S.Ct. at 1764. Shipping company customers, including Animal-Feeds International Corp., ship their "goods pursuant to a standard contract known in the maritime trade as a charter party." *Id.* There are "[n]umerous charter parties in use and charterers like Animal-Feeds, or their agents—not the shipowners—typically select the charter party that governs their shipments." *Id.* at 1764–65. AnimalFeeds shipped its goods pursuant to a charter party that provided in relevant part:

> Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedures of the United States Arbitration Act [i.e., the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator.

*Id.* at 1765 (internal quotation omitted).

AnimalFeeds, along with other charterers, sued Stolt–Nielsen, alleging illegal price fixing. As a result of various court decisions, AnimalFeeds and Stolt–Nielsen were required to arbitrate their antitrust dispute. *Id.* AnimalFeeds served a demand for class arbitration. *Id.* The parties agreed to have an arbitration panel decide the threshold issue of whether the charter party permitted class arbitration, and stipulated before the panel that the arbitration clause was silent on the issue of class arbitration. *Id.* at 1765–66. The arbitration panel heard evidence and argument, including testimony from Stolt–Nielsen's experts regarding arbitration customs and usage in the maritime trade. *Id.* at 1766. The panel concluded that the expert testimony offered did not demon-

strate an "inten[t] to preclude class arbitration." *Id.* (bracket in original). After finding that the issue was controlled by the Supreme Court's decision in *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), the panel concluded *Bazzle* and policy considerations dictated finding the clause permitted class arbitration. *Id.*

Stolt–Nielsen sought to vacate the arbitration award in the United States District Court for the Southern District of New York. *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 435 F.Supp.2d 382 (S.D.N.Y. 2006). The district court found the arbitration panel's decision was made in "manifest disregard" of the law. The district court found *Bazzle* controlling only to the extent that the decision about class arbitrability was one for the arbitration panel to decide, and that *Bazzle* did not speak to the issue of whether the clause permitted class arbitration. *Id.* at 384–85. The district court also found that if the panel had undertaken a "meaningful" choice of law analysis, it would have concluded that maritime and New York state law applied. *Id.* at 385. The Court then concluded that the clause precluded class arbitration. *Id.* at 386.

On appeal, our Court reversed. *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85 (2d Cir.2008). Noting that at oral argument counsel for Stolt–Nielsen conceded that the issue was one of first impression, we concluded that the relevant maritime and state law was inconclusive on the issue. *Id.* at 98. In the absence of a clear maritime or state rule on the issue, we found that the arbitration panel could not have been in manifest disregard of the law.

*Id.* at 98–100.

■ The Supreme Court reversed. *Stolt–Nielsen,* 130 S.Ct. at 1768–73. The Court found that the arbitration panel "im-posed its own policy choice," rather than "identifying and applying a rule of decision derived from the FAA or either maritime or New York law," and "thus exceeded its powers." *Id.* at 1770. Tackling the issue itself, the Court found the FAA controlling, *id.* at 1773, and reaffirmed that "arbitration is simply a matter of contract between the parties." *Id.* at 1774 (emphasis and brackets omitted). The Court continued:

> It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties.

*Id.* at 1774–75. Applying those principles to the case before it, the Court concluded that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in the original).

Amex urges that our decision cannot stand in the wake of *Stolt–Nielsen,* reading the decision as "repeatedly emphasiz[ing] courts' obligation to faithfully *enforce* (not just construe) the parties' arbitration agreement." (Amex. Supp. Reply Br. at 1) Amex argues that:

> *Stolt–Nielsen*'s holding that courts may not impose class arbitration on unwilling parties cannot be reconciled with appellants' contention that courts can invalidate the parties' agreement ... based on the absence of class procedures.

(Amex Supp. Reply Br. at 2) We disagree. *Stolt–Nielsen* states that parties cannot be forced to engage in a class arbitration absent a contractual agreement to do so. It does not follow, as Amex urges, that a contractual clause barring class arbitration is *per se* enforceable. Indeed, our prior holding focused not on whether the plain-

tiffs' contract provides for class arbitration, but on whether the class action waiver is enforceable when it would effectively strip plaintiffs of their ability to prosecute alleged antitrust violations.

■ Section 2 of the FAA, 9 U.S.C. § 2, provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." As "the primary substantive provision," Section 2 "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the" FAA. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In our previous opinion, we jointed other Circuits that evaluate the enforceability of the class action waivers under the federal substantive law of arbitrability. *See Gay v. CreditInform*, 511 F.3d 369, 394–95 (3d Cir.2007) (holding class action waiver to be enforceable under Section 2 of the FAA notwithstanding claim that waiver was unconscionable under state law); *Kristian v. Comcast Corp.*, 446 F.3d 25, 63 (1st Cir.2006) ("Although Plaintiffs' challenges to the enforceability of the arbitration agreements could be evaluated through the prism of state unconscionability law, we have chosen to apply a vindication of statutory rights analysis, which is also part of the body of federal substantive law of arbitration . . .").

■ Class action lawsuits are well-recognized by the Supreme Court as a vehicle for vindicating statutory rights. This is especially true with respect to the Court's recognition that the class action device is the only economically rational alternative when a large group of individuals or entities has suffered an alleged wrong, but the damages due to any single individual or entity are too small to justify bringing an individual action. The Court made the point forcefully more than thirty years ago in the context of an antitrust action:

> A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all.

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Thus, as the Court later opined, " '[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.' " *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997)); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) ("[A class action] may motivate [plaintiffs] to bring cases that for economic reasons might not be brought otherwise[, thereby] vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost."); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.2004) ("[T]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." (emphasis omitted)).

The Court addressed the use of class actions as a vehicle for vindicating statutory rights in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). *Gilmer* involved a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621

et seq. Specifically, the plaintiff, a manager at a brokerage firm, asserted that he had been terminated by the firm in violation of the ADEA. *Id.* at 23, 111 S.Ct. 1647. After the plaintiff had filed suit in federal district court, the defendant firm moved to compel arbitration pursuant to a mandatory arbitration provision contained in the rules of the New York Stock Exchange ("NYSE"), to which the plaintiff had agreed to be bound when he became a registered securities representative. *Id.* at 23–24, 111 S.Ct. 1647. The *Gilmer* Court held that because "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement," the arbitration clause was enforceable " 'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Id.* at 26, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Even though the Court acknowledged that "the ADEA is designed not only to address individual grievances, but also to further important social policies," *id.* at 27, 111 S.Ct. 1647, it discerned no Congressional intent to preclude ADEA claims from being subject to arbitration. The Court also considered the plaintiff's argument to the effect "that arbitration procedures cannot adequately further the purposes of the ADEA because they do not provide for broad equitable relief and class actions." *Id.* at 32, 111 S.Ct. 1647. The Court rejected this contention, finding that:

> arbitrators do have the power to fashion equitable relief. Indeed, the NYSE rules applicable here do not restrict the types of relief an arbitrator may award, but merely refer to "damages and/or other relief." The NYSE rules also provide for collective proceedings. But even if the arbitration could not go forward as a class action or class relief

could not be granted by the arbitrator, the fact that the ADEA provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.

*Id.* (citations, internal quotation marks, and brackets omitted).

The Third Circuit, among others, relied on the final sentence of this passage to uphold a mandatory arbitration clause. *Johnson v. W. Suburban Bank,* 225 F.3d 366 (3d Cir.2000), dealt with a claim under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. The plaintiffs argued that their class action claim in federal court was not subject to mandatory arbitration because TILA:

> effectively create[s] an unwaivable right to bring a class action ... [In TILA,] Congress enacted a scheme in which the court hearing a class action could set a damage figure up to a certain amount for certain patterns of conduct. This judicial flexibility in imposing damages up to $500,000 only exists if a class action is allowed, as individual plaintiff claims are generally capped at $1,000. Therefore, a right of classes to a judicially crafted punitive remedy is lost if this court orders arbitration of Johnson's claims.

*Id.* at 377.

The Third Circuit held that "[t]his argument is unavailing in light of" *Gilmer. Id.* The court noted that *Gilmer* involved a claim under the ADEA, a statute which explicitly provides in its text for the bringing of class actions. *Id.* (citing 29 U.S.C. § 626(b)). In spite of this, the court concluded, "the Supreme Court still ruled that the ADEA did not preclude arbitration notwithstanding the unavailability of the class action remedy there." *Id.; see also Carter v. Countrywide Credit Indus., Inc.,*

362 F.3d 294, 298 (5th Cir.2004) ("[W]e reject the [plaintiffs'] claim that their inability to proceed collectively [in arbitration] deprives them of substantive rights available under the [Fair Labor Standards Act.] The Supreme Court rejected similar arguments concerning the ADEA in *Gilmer*. . . .").

We cannot agree with this view of *Gilmer* because a collective and perhaps a class action remedy was, in fact, available in that case. As set forth above, the Supreme Court explicitly noted that the arbitration rules of the NYSE provided for the conduct of collective arbitration. *Gilmer*, 500 U.S. at 32, 111 S.Ct. 1647. At the time *Gilmer* was decided, the NYSE's rules may also have permitted arbitration claims submitted as class actions. *Compare* NYSE Rule 600(d) (2008) ("A claim submitted as a class action shall not be eligible for arbitration under the Rules of the Exchange.") *with* NYSE Rule 612(d) (1991) (containing no prohibition on class actions). The statement in *Gilmer* that the arbitration clause would be enforceable "even if" class remedies were available evidences that the Court itself was uncertain, but acknowledged the probability, that class actions were feasible under the NYSE's rules. Moreover, it is dicta that does not apply here. The plaintiffs do not proffer the argument rejected in *Gilmer*, namely that the class action waiver is unenforceable merely because the relevant statute allows class actions. Rather, the conundrum presented by the instant appeal is more nuanced: whether the mandatory class action waiver in the Card Acceptance Agreement is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement of the waiver would be to preclude their bringing Sherman Act claims against Amex in either an individual or collective capacity.

*Green Tree Financial Corp.–Alabama v. Randolph* also involved the enforcement of a statutory right, this time under the TILA. 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). The specific issue to be decided was "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." *Randolph*, 531 U.S. at 82, 121 S.Ct. 513. The plaintiff argued "that the arbitration agreement's silence with respect to costs and fees creates a 'risk' that she will be required to bear prohibitive arbitration costs if she pursues her claims in an arbitral forum, and thereby forces her to forgo any claims she may have had against [the defendants]." *Id.* at 90, 121 S.Ct. 513. The Supreme Court rejected this argument because the plaintiff had proved no more than that the asserted "risk" was hypothetical:

> It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter . . . The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Id.* at 90–91, 121 S.Ct. 513.

Other Circuits also observed that a plaintiff could challenge a class action waiver clause on the grounds that it would be a cost prohibitive method of enforcing a statutory right, provided that a plaintiff set forth sufficient proof to support such a

finding. *See, e.g., In re Cotton Yarn Antitrust Litig.,* 505 F.3d 274, 285 (4th Cir. 2007) ("[I]f a party could demonstrate that the prohibition on class actions likely would make arbitration prohibitively expensive, such a showing could invalidate an agreement."); *Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553, 557 (7th Cir.2003) ("In the present case, the [plaintiffs] have not offered any specific evidence of arbitration costs that they may face in this litigation, prohibitive or otherwise, and have failed to provide any evidence of their inability to pay such costs. . . ."); *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th Cir. 2002) ("[Lead plaintiff] makes no showing of the specific financial status of any of the plaintiffs at the time this action was brought. He provides no basis for a serious estimation of how much money is at stake for each individual plaintiff.").

 We continue to find *Randolph* "controlling here to the extent that it holds that when 'a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.'" *In re Am. Express,* 554 F.3d at 315 (quoting *Randolph,* 531 U.S. at 92, 121 S.Ct. 513). The Supreme Court also recognized that public policy concerns might bar enforcement of an agreement to arbitrate in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The *Mitsubishi* Court recognized, however, that there might be instances in which an arbitration agreement contained provisions that would be unenforceable because they would prevent a prospective litigant from vindicating its rights under the Sherman Act in an arbitral forum. *Id.* at 637, 105 S.Ct. 3346. Specifically, the amici in *Mitsubishi* speculated that the choice-of-forum and choice-of-law clauses in the arbitration agreement at issue would effectively preclude the arbitrator from determining the plaintiff's substantive claims in accordance with the terms of the Sherman Act. *Id.* at 637, n. 19, 105 S.Ct. 3346. The Court responded that it would not prevent the case from going to arbitration based upon mere conjecture as to what body of law the arbitrator would apply, but also continued as follows:

> We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.

*Id.* at 637 n. 19, 105 S.Ct. 3346. While dicta, it is dicta based on a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy. More than a half-century ago, the Supreme Court stated that "in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest. *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *see also Minnesota Mining and Mfg. Co. v. Graham–Field, Inc.,* No. 96 cv 3839, 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("GFI could not have waived [its antitrust] claim in the releases because a prospective waiver of an antitrust claim violates public policy.").

 We find the record evidence before us establishes, as a matter of law, that the cost of plaintiffs' individually arbitrating their dispute with Amex would be prohibi-

tive, effectively depriving plaintiffs of the statutory protections of the antitrust laws. Plaintiffs submitted to the district court a detailed affidavit from Gary L. French, Ph.D., an economist associated with Nathan Associates Inc., a financial consulting firm retained by the plaintiffs. Dr. French stated that the purpose of his affidavit was "to provide an expert opinion concerning the likely costs and complexity of an expert economic study concerning the liability and damages" relating to this action, and to compare this with "the potential recovery of damages by an American Express Card merchant with annual sales volume of $10 million or less, such as most if not all of the named plaintiffs in this litigation, and to provide my opinion as to whether it would be economically rational for such a merchant to pursue recovery of damages given the likely out-of-pocket costs of the arbitration or litigation proceeding." (A362, ¶ 4)

Dr. French continued:

Due to the complexity and analytical intensity of an antitrust study, total expert fees and expenses usually are substantial, even in a non-class action involving an individual plaintiff. In my experience, even a relatively small economic antitrust study will cost at least several hundred thousand dollars, while a larger study can easily exceed $1 million.... In summary, the cost of [Nathan Associates'] expert assistance in individual plaintiff antitrust cases has ranged from about $300 thousand to more than $2 million. However, after reviewing the complaint and doing some preliminary research in this case, it is my opinion that ... the cost for this case will fall in the middle of the range of [Nathan Associates'] experience.

(A362–63, ¶ 4) Dr. French then considered the economic rationality of bringing an individual action against Amex in light of these substantial expert witness costs:

The median volume merchant, with half of the named plaintiffs having more and half having less American Express charge volume, and having reported $230,343 American Express Card volume in 2003, might expect four-year damages of $1,751, or $5,252 when trebled.... The largest volume named plaintiff merchant, with reported American Express Card volume of $1,690,749 in 2003, might expect four-year damages of $12,850, or $38,549 when trebled.

In my opinion as a professional economist ... it would not be worthwhile for an individual plaintiff ... to pursue individual arbitration or litigation where the out-of-pocket costs, just for the expert economic study and services, would be at least several hundred thousand dollars, and might exceed $1 million.

(A365, ¶ 10–11)

Dr. French's affidavit demonstrates that the only economically feasible means for enforcing their statutory rights is via a class action. As discussed in our earlier opinion, the district court did not directly address Dr. French's affidavit, focusing instead on the damages provision of the Clayton Act, 15 U.S.C. § 15(a). *In re Am. Express*, 554 F.3d at 317. We found that while the Clayton Act does provide for treble awards along with the recovery of attorneys' fees and expenses, that was unlikely to assist plaintiffs here, where "the trebling of a small individual damages award is not going to pay for the expert fees Dr. French has estimated will be necessary to make an individual plaintiff's case." *Id.* We also found the Clayton Act's fee-shifting provisions inadequate to alleviate our concerns given the low expert witness reimbursement rate. *Id.* at 318. "Even with respect to reasonable attorney's fees, which are shifted under Section

4 of the Clayton Act, the plaintiffs must include the risk of losing, and thereby not recovering any fees, in their evaluation of their suit's potential costs." *Id.*

As we did earlier, we find "Amex has brought no serious challenge to the plaintiffs' demonstration that their claims cannot reasonably be pursued as individual actions, whether in federal court or in arbitration." *In re Am. Express,* 554 F.3d at 319. We again conclude "that enforcement of the class action waiver in the Card Acceptance Agreement 'flatly ensures that no small merchant may challenge American Express's tying arrangements under the federal antitrust laws.'" *Id.* Eradicating the private enforcement component from our antitrust law scheme cannot be what Congress intended when it included strong private enforcement mechanisms and incentives in the antitrust statutes. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("[p]rivate suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."); *see also* Dando B. Cellini, *"An Overview of Antitrust Class Actions,"* 49 Antitrust L.J. 1501, 1506 (1980) (discussing private, class action antitrust lawsuits and observing that "it is obvious from the experience over the last fifteen years since the 1966 amendments to Rule 23 were adopted that linking an antitrust claim with a class action allegation can be devastatingly effective.").

■ Thus, as the class action waiver in this case precludes plaintiffs from enforcing their statutory rights, we find the arbitration provision unenforceable. The two caveats we articulated in our original opinion still apply. *In re Am. Express,* 554 F.3d at 320. Our decision in no way relies upon the status of plaintiffs as "small" merchants. We rely instead on the need for plaintiffs to have the opportunity to vindicate their statutory rights. In this case, the record demonstrates that the size of any potential recovery by an individual plaintiff will be too small to justify the expense of bringing an individual action. Moreover, we do not conclude here that class action waivers in arbitration agreements are per se unenforceable. We also do not hold that they are per se unenforceable in the context of antitrust actions. Rather, we hold that each case which presents a question of the enforceability of a class action waiver in an arbitration agreement must be considered on its own merits, governed with a healthy regard for the fact that the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24, 103 S.Ct. 927.

Amex argues that *Stolt–Nielsen* expressly rejects the use of public policy as a basis for finding contractual language void. We disagree. While *Stolt–Nielsen* plainly rejects using public policy as a means for divining the parties' intent, nothing in *Stolt–Nielsen* bars a court from using public policy to find contractual language void. We agree with plaintiffs that "[t]o infer from *Stolt–Nielsen*'s narrow ruling on contractual construction that the Supreme Court meant to imply that an arbitration is valid and enforceable where, as a demonstrated factual matter, it prevents the effective vindication of federal rights would be to presume that the *Stolt–Nielsen* court meant to overrule or drastically limit its prior precedent." (Plaintiffs' Supp. Brief, p. 7) Following the *Stolt–Nielsen* decision, our court reached a similar conclusion in considering a different iteration of the issue: whether class action waivers are unconscionable as a matter of state law. *Fensterstock v. Educ. Fin. Partners,* 611 F.3d 124, 140 (2d Cir.2010).

As *Fensterstock* recognizes, however, *Stolt–Nielsen* does alter what relief this Court may order. *Stolt–Nielsen* plainly precludes us from ordering class-wide arbitration, but we did not do so earlier. *Fensterstock*, 611 F.3d at 139–41; *In re Am. Express*, 554 F.3d at 321. Indeed, we specifically stated in our earlier opinion that we were remanding to the district court to "allow Amex the opportunity to withdraw its motion to compel arbitration," *In Re Am. Express*, 554 F.3d at 321, and it appears that Amex did so, choosing litigation over arbitration. (Amex Supp. Br. p. 5, n. 1) Our ruling does not disrupt the current status quo. Hence, we remand to the district court for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons given above, the decision of the district court is REVERSED. We REMAND to the district court for further proceedings consistent with this opinion.